## UNITED STATES COURT OF INTERNATIONAL TRADE

|  |  |  |
|---|---|---|
| STRATO, INC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Court No. 23-00158 |
| | ) | |
| UNITED STATES, | ) | PUBLIC VERSION |
| | ) | |
| Defendant. | ) | |
| | ) | |

## COMPLAINT

Plaintiff Strato, Inc. ("Strato"), by and through its attorneys, alleges and states as follows:

1.      Strato challenges the International Trade Commission's ("USITC" or "Commission") final affirmative material injury determinations in the antidumping duty ("ADD") and countervailing duty ("CVD") investigations of certain freight rail couplers ("FRCs") and parts thereof from China ("*FRCs II*").  *See Certain Freight Rail Couplers and Parts Thereof from China*, 88 Fed. Reg. 43,398 (Int'l Trade Comm'n, July 7, 2023).  The public version of the Views and Dissenting Views of the Commission are contained in *Certain Freight Rail Couplers and Parts Thereof from China*, Inv. Nos. 701-TA-682 and 731-TA-1592 (Final), USITC Pub. 5438 (July 2023) ("*Final Determination*").

## JURISDICTION

2.      This challenge is brought pursuant to 19 U.S.C. §§ 1516a(a)(2)(A)(i)(II) and (a)(2)(B)(i).  This Court therefore has jurisdiction over this matter pursuant to 28 U.S.C. § 1581(c).

## STANDING

3.      Strato is a U.S. importer of freight rail couplers from China; thus, Strato is an interested party under 19 U.S.C. § 1677(9)(A).

4.      Strato participated in the proceedings before the Commission giving rise to this action; thus, Strato is a "party to the proceeding in connection with which the matter arose."  28 U.S.C. § 2631(c); *see* 19 U.S.C. § 1516a(a)(2)(A).

## TIMELINESS OF THIS ACTION

5.      After the Commission issued the *Final Results*, the U.S. Department of Commerce ("Commerce") published notice of the ADD and CVD Orders on July 14, 2023.  *See Certain Freight Rail Couplers and Parts Thereof From the People's Republic of China: Countervailing Duty Order*, 88 Fed. Reg. 45,135–45,138 (Dep't of Commerce, July 14, 2023) ("*CVD Order*"); *Certain Freight Rail Couplers and Parts Thereof From the People's Republic of China: Antidumping Duty Order*, 88 Fed. Reg. 45,138–45,140 (Dep't of Commerce, July 14, 2023) ("*ADD Order*").

6.      Strato commenced this action on August 14, 2023, by filing its Summons within the time period specified in 19 U.S.C. § 1516a(a)(2)(A)(i)(II).

7.      Strato's Complaint is timely filed within 30 days of the filing of its Summons, as required by 19 U.S.C. § 1516a(a)(2)(A) and U.S. Court of International Trade Rule 3(a)(2).

## STATEMENT OF FACTS

### Procedural History - The Predecessor Case ("FRC I")

8.      On September 29, 2021, approximately one year before the filing of the petition initiating the challenged investigation, the same petitioner, the Coalition of Freight Coupler Producers ("Petitioner"), ███████████████████████████████████ consisting of McConway and Torley, LLC ("M&T") and Amsted Rail Co., Inc. ("Amsted"), domestic

producers of FRCs, filed a petition asking the Commission to reach an affirmative determination of material injury due to imports of certain freight rail couplers and parts from China ("*FRC I*").

9.      Shortly thereafter, Amsted withdrew as a Petitioner and the United Steel, Paper, and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union, AFL-CIO, CLC ("USW"), the labor union in Amsted's U.S. facility was added as a Petitioner.

10.     Until its withdrawal, Amsted supervised and materially contributed to █████ ███████ preparation for the *FRC I* investigation.  Both before and after the petition's filing, Amsted confided in ██████████ its legal strategy for prosecuting FRC-related trade investigations, competitive decision-making processes, and extensive FRC-related business proprietary information relevant to establishing the scope of domestic like product, the domestic industry, and the conditions of competition.

11.     The class or kind of merchandise subject to the Petition were freight rail coupler systems and four components thereof: knuckles, coupler bodies, coupler yokes, and follower blocks ("Subject FRC I Imports").

12.     Strato and Wabtec Corporation ("Wabtec") accounted for a majority of Subject FRC I imports.

13.     Petitioner argued that FRCs imported from Mexico were a source of material injury to the domestic industry.  Petitioner claimed that nonsubject imports from Mexico were injurious because they were a direct result of the domestic industry's effort to compete with Chinese imports.

14.     On March 7, 2022, provisional CVD of 265.99 percent was imposed on Subject FRC I Imports from China; on March 15, 2022, provisional ADD of 116.70 percent was

imposed.  *Freight Rail Coupler Systems and Certain Components Thereof: Preliminary Affirmative Countervailing Duty Determination*, 87 Fed. Reg. 12,662 (March 7, 2022); *Freight Rail Coupler Systems and Certain Components Thereof From the People's Republic of China: Preliminary Affirmative of Sales Determination at Less-Than-Fair Value*, 87 Fed. Reg. 14,511 (March 15, 2022).  For shipments entered on and after these dates, importers were required to deposit estimated ADD/CVD of 382.69 percent upon entry, liquidation of entries was suspended, and the suspended entries potentially were subject to ADD/CVD of 382.69 percent.  *Id*.

15.     On July 5, 2022, the Commission issued a unanimous negative injury determination.  The Commission found that "an industry in the United States is not materially injured or threatened with material injury by reason of subject imports from China that are sold in the United States." *Freight Rail Coupler Systems and Components From China*, 87 Fed. Reg. 41,144 (July 11, 2022)

16.     The Commission's investigation focused on the three-year period 2019 – 2021, which established that the domestic industry was not currently experiencing material injury or threat thereof as of the date of the Commission vote, i.e., July 5, 2022.

17.      The Commission found that that petitioner had "fail{ed} to show that subject imports had significant price depressing effects," failed to demonstrate that "low-priced subject imports" had "significantly undersold the domestic like product," and failed to provide evidence that "lower offers by subject imports undercu{t} domestic producers' prices."  The Commission thus did "not find that the subject imports … had significant price effects on the domestic industry." *Freight Rail Coupler Systems and Components from China, Investigation*, Nos. 701-TA-670 and 731-TA-1570 (Final), Pub. No. 5331 (July 2022).

18.     In considering the impact of subject imports, the Commission found that "other factors" unrelated to price "affected domestic prices." *Id*. Those factors included "declines in demand," changes in "relative consumption in the OEM and replacement market segment," "M&T's … most favored customer pricing clause in its long-term supply agreement with Trinity," and a number of other non-price-related factors. *Id*. The Commission also found that, for a meaningful portion of the market, the use of Bedloe technology was a distinguishing factor as between domestic products and subject imports.

19.     The Commission's negative threat decision was based on multiple factors, including the following: (1) "while the subject {Chinese} industry has the ability to increase its exports to the United States in the imminent future, that ability also existed during the POI and did not materialize ;" (2) "barriers to enter the U.S. market limits the potential for additional subject imports, as Chinese foundries are unable to sell FRCs to purchasers in the U.S. market without appropriate certification from the AAR, which requires partnership with or sponsorship by an AAR member;" (3) "a licensing agreement filed to the record contains provisions that restrain certain AAR-certified foundries in China from selling outside of their home market and certain other markets, including North America;" (4) "the record does not suggest that subject imports' pricing behavior was getting increasingly aggressive toward the end of the POI such that they may imminently cause adverse price effects on the domestic industry;" and (5) "the subject imports were not a material cause of the industry's condition . . .." *Id*.

20.     Shortly thereafter, in August 2022, Commerce issued instructions to Customs and Border Protection ("CBP") advising that: (1) ADD/CVD no longer were required to be deposited on subject FRC I imports; (2) cash deposits on prior entries should be refunded to importers; and (3) liquidation of entries no longer was suspended.

21.     Having previously stopped importing due to prohibitively high provisional ADD/CVD duties, Strato and Wabtec resumed importing FRCs from China after the Commission's final negative determination.

22.     Petitioner did not appeal the Commission's negative decision to the Court of International Trade.

## Procedural History – the Challenged Investigation ("FRC II")

23.     On September 28, 2022, the same petitioning coalition, consisting of M&T and the UAW, █████████████████████████, filed a new petition with the Commission alleging that certain freight railcar couplers, consisting of coupler bodies and knuckles (also known as "fits" or "assemblies") and parts thereof (i.e., knuckles and coupler bodies imported separately) imported from Mexico and China were materially injuring the domestic industry and threatening the domestic industry with material injury.

24.     Amsted's wholly owned affiliate, ASF-K de Mexico S. de R.L. de C.V., was the sole producer of subject FRCs in Mexico during the *FRC II* period of investigation, i.e., 2020-2023.

25.     Amsted imported subject FRCs from its affiliate in Mexico and Strato and Wabtec remained the main importers of subject FRCs from China.

26.     On October 12, 2022, Amsted requested that the Commission disqualify ██ ███████████████████████████, from participating in the *FRCs II* investigation. Amsted advised that: (1) Amsted and ██████████ had an attorney-client relationship in preparing for *FRCs I*; (2) in *FRCs II*, Amsted's interests were materially adverse to Petitioner's interests, since Petitioner accused Amsted of using unfair prices to take sales and market share from M&T

6

and sought trade relief that would economically benefit Petitioner and harm Amsted; (3) ███

███ had improperly sided with one client against the other; (4) Amsted was threatened by

misuse of ██████ intimate knowledge of its legal strategy for prosecuting FRC-related

trade investigations, competitive decision-making processes, and extensive FRC-related BPI; and

(5) Amsted has never consented, and would not consent, to ██████ representation of M&T

in *FRCs II*.  Based on these reasons, Amsted requested that the  Commission disqualify ██

████████████, from further participation in *FRCs II*.

     27.    The Commission explicitly declined to address Amsted's allegations of attorney

misconduct or to make any determination as to the ethical conflicts, instead taking the position

that its regulations regarding attorney misconduct are not "intended to cover ethical conflicts

uniquely within the province of local Bar authorities."

     28.    Interested parties, including Amsted, Strato, and TTX Corp. (a purchaser that had

also participated in *FRCs I*), challenged the Commission's failure to address the allegations of

attorney misconduct actions in the Court of International Trade, which by decision dated

November 15, 2022, dismissed their claim for lack of subject matter jurisdiction, without

prejudice to refiling once a claim under 28 U.S.C. § 1581(c) is ripe; i.e., unless and until the

Commission issued a final affirmative determination in *FRCs II*.  See *Amsted Rail Company, Inc.

v U.S. International Trade Commission*, 600 F. Supp. 3d 1308 (CIT 2022).

     29.    During the *FRCs II* investigation, Petitioner's counsel admitted that petitioner

"refiled" its new petition in *FRCs II* in an attempt to remedy inadequacies in the case it brought

in *FRCs I*.  Whereas Petitioner had argued that imports from Mexico were an indirect source of

material injury driven by competition with China in *FRCs I*, Petitioner formally named Mexico

as a subject country in *FRCs II*.

30.   The class or kind of merchandise subject to the *FRCs II* petition were knuckles, and coupler bodies, and combinations of knuckles and coupler blocks, known as "fits" or "assemblies" ("Subject FRCs II Imports").  These same products had been subject to *FRCs I,* and were the primary focus of the Commission's *FRCs I* material injury investigation and negative determination.

31.   On September 29, 2022, the Commission published its notice of institution of the preliminary ADD and CVD investigations into certain freight rail couplers and parts thereof from China.  *Certain Freight Rail Couplers and Parts Thereof From the People's Republic of China: Institution of Antidumping and Countervailing Duty Investigations and Scheduling of Preliminary Phase Investigations*, 87 Fed. Reg. 60,413, 414 (Oct. 5, 2022).

32.   Strato, Amsted, Wabtec, and TTX participated in the preliminary phase, opposing the petition.   Strato, Wabtec and TTX had fully participated in and opposed *FRCs I*.

33.   In briefing, the opposing parties argued, among other things, that: (1) Section 751(b) of the Tariff Act barred the new investigations into imports from China as such investigations would entail an impermissible review of the Commission's negative determination in *FRCs I*; (2) the Commission has the inherent authority in administering the Tariff Act to guarantee the integrity and finality of its determinations and should exercise this authority to reach a negative determination in *FRCs II*; (3) the Commission should not cumulate imports from China and Mexico in *FRCs II,* in light of the exception to cumulation in Section 771(7)(G)(ii)(II) of the Tariff Act, and (4) that, even if cumulated, the Commission should find no reasonable indication of material injury for various reasons.

34.   On November 15, 2022, the Commission published its preliminary determination in *FRCs II*, finding that "there is a reasonable indication that an industry in the United States is

materially injured by reason of imports of certain freight rail couplers and parts thereof from China and Mexico." *Certain Freight Rail Couplers and Parts Thereof From the People's Republic of China and Mexico*, 87 Fed. Reg. 69, 340 (Nov. 18, 2022).  The public version of the Views of the Commission is contained in *Certain Freight Rail Couplers and Parts Thereof from China and Mexico*, Inv. Nos. 701-TA-682 and 731-TA-1592 (Preliminary), USITC Pub. 5387 (Nov. 2022) ("*Preliminary Determination*").

35.     In the *Preliminary Determination*, the Commission found that Section 751(b) was inapplicable and that the Commission lacked authority to reach a negative determination in *FRCs I. Id.* at 38-39.  It also found that cumulation of imports from China and Mexico was appropriate.  *Id.* at 34 & n. 146.  The Commission did not discuss ██████████ conflict of interest.

36.     On March 3, 2023 (CVD) and March 13, 2023 (ADD), Commerce published affirmative preliminary determinations of subsidization and dumping on subject imports from China. *Certain Freight Rail Couplers and Parts Thereof From the People's Republic of China: Preliminary Affirmative Countervailing Duty Determination and Preliminary Affirmative Critical Circumstances Determination*, 88 Fed. Reg. 13,425 (Mar. 3, 2023);  *Certain Freight Rail Couplers and Parts Thereof From the People's Republic of China: Preliminary Affirmative Determination of Sales at Less Than Fair Value and Preliminary Affirmative Determination of Critical Circumstances*,  88 Fed. Reg. 15,372 (Mar. 13, 2023).  As a result, importers were required to deposit 265.99 percent estimated CVD and 169.90 percent estimated ADD upon entry of subject merchandise from China, and liquidation of entries was suspended. *Id.*

37.     On March 9, 2023, the Commission commenced the final phase of the *FRCs II* investigations.  *See Certain Freight Rail Couplers and Parts Thereof From the People's*

*Republic of China and Mexico: Scheduling of the Final Phase of Countervailing Duty and Antidumping Duty Investigations*, 88 Fed. Reg. 16,031 (Mar. 15, 2023).

38.     Strato, Wabtec, Amsted, and TTX submitted pre- and post-hearing briefs and participated in the Commission's hearing presenting arguments opposing the petition.

39.     Opposing parties again argued, among other things, that: (1) Section 751(b) barred the Commission from reaching an affirmative determination with respect to FRCs from China; (2) the Commission had the inherent authority to safeguard the integrity of its negative determination in *FRCs I* by reaching a negative determination in *FRCs II*; (3) the exception to cumulation in Section 771(7)(G)(ii)(II) of the Tariff Act applied and barred the Commission from cumulating imports from China and Mexico, and (4) even if cumulated, there was no material injury or threat of material injury (either on a cumulated or de-cumulated basis), by reason of imports from Mexico and/or China, for various reasons.

40.     On May 19, 2023, Commerce published notice in the *Federal Register* of its final affirmative determination in the CVD investigation of certain freight rail couplers and parts thereof from China.  *See Certain Freight Rail Couplers and Parts Thereof From the People's Republic of China: Final Affirmative Countervailing Duty Determination and Final Affirmative Critical Circumstances Determination, In Part*, 88 Fed. Reg. 32,184 (May 19, 2023).  On May 30, 2023, Commerce published notice in the *Federal Register* of its final affirmative determination in the ADD antidumping investigation of certain freight rail couplers and parts thereof from China.  *Certain Freight Rail Couplers and Parts Thereof From the People's Republic of China: Final Affirmative Determination of Sales at Less-Than-Fair Value and Final Affirmative Determination of Critical Circumstances*, 88 Fed. Reg. 34,485 (May 30, 2023).

41.     On June 14, 2023, the Commission voted 3 to 1 that the domestic industry is materially injured by reason of imports of FRCs from China.  The Commission published the notice of its final determinations in the *Federal Register* on July 7, 2023.  *See Certain Freight Rail Couplers and Parts Thereof From the People's Republic of China,* 88 Fed. Reg. 43, 398–43,399 (July 7, 2023).  The Views and Dissenting Views of the Commission are set forth in the *Final Determination*.

42.     In the Majority Views, three Commissioners (Kearns, Schmidtlein, and Karpel) determined that the domestic industry is materially injured by reason of subject imports.  In his Dissenting Views, Chairman Johanson determined that the domestic industry is not materially injured or threatened with material injury by reason of subject imports.  In Separate Views, Chairman Johanson and Commissioner Karpel dissented from the majority's decision not to exclude one domestic producer from the definition of the domestic industry in these investigations.  Commissioner Stayin did not participate in these investigations.

43.     Commerce published CVD and ADD Orders on imports of FRCs from China on July 14, 2023.  *CVD Order*, 88 Fed. Reg. 45,135 (July 14, 2023); *ADD Order*, 88 Fed. Reg. 45,138 (July 14, 2023).

## Issues in the Commission's Final Determination

## Procedural Issues

44.     The Commission issued its *Final Determination* notwithstanding its prior negative determination in *FRCs I.*  In reaching this decision, the Commission did not address Section 751(b)'s limits on the ability of the Commission to review its prior negative determinations in *FRCs I.*  Also, the Commission neither acknowledged nor exercised its inherent authority to preserve the integrity of its decisions in *FRCs I* by reaching a negative

determination in *FRCs II*.  Finally, the Commission did not address ███████ conflict of interest.

### Definition of Domestic Industry

45.     In defining the domestic industry in its final determination, the Commission reversed its preliminary decision to exclude one domestic producer from the domestic industry for purposes of its material injury analysis and instead defined "a single domestic industry consisting of all U.S. producer{s} of FRCs."  USITC Pub. 5438 at 22.

46.     The Commission reasoned that "even if a U.S. producer's current primary interest is not in domestic production, that alone is not dispositive in the Commission's related party analysis when the record shows the related party is not shielded from subject import competition and its exclusion from the industry would mask the effects of subject imports on the industry." *Id.* at 17.

47.     The Commission found both factors present here.  First, it found that the record did not indicate that the related party's "domestic production activities were shielded from competition with subject imports from China and Mexico during the POI, or otherwise benefited from … subject imports from Mexico during the period."  *Id.* at 22.  Second, the Commission found that "its exclusion from the domestic industry would mask declines in the industry's performance caused by subject import competition, including data relating to market share, employment, capacity utilization, and financial performance."  *Id.*

48.     The Commission thus found "that appropriate circumstances do not exist to exclude" the firm "from the domestic industry as a related party."  *Id.*

## Cumulation of Subject Imports

49.     The Commission also decided to "cumulate subject imports from China and Mexico for purposes of {its} material injury analysis." *Id.* at 27.  The Commission found that "{t}he statutory threshold for cumulation is satisfied in these investigations because petitioners filed the antidumping and countervailing duty petitions with respect to both subject countries on the same day, September 28, 2022." *Id.* at 25.  It also found "a reasonable overlap of competition between imports from both subject countries, and between subject imports from each source and the domestic like product." *Id.*

50.     In reaching these conclusions, the Commission rejected the argument that the exception to cumulation in Section 771(7)(G) applied because imports from China were subject to a prior negative determination in *FRCs I.  Id.* at 24.  The Commission reasoned that "the current investigations are not the same investigations as those in FRC I" and "that a negative determination in a prior investigation is not the same as a termination in these investigations," such that the statutory exception to cumulation did not apply.  *Id.* at 24 & n. 114.

51.     In reaching this decision, the Commission ignored language in the Statement of Administrative Action (SAA) to the Uruguay Round Agreements Act (URAA), which identifies the key inquiry as whether the specific "imports" at issue "are the subject of terminated investigations," not simply whether the *current* investigation into the imports has been terminated.  *See* H.R. Rep. No. 103316, Vol. I at 849 (1994).

## Material Injury Analysis

52.     In its material injury analysis, the Commission found that the domestic industry improved by virtually every measure over the POI.  The domestic industry's market share increased over the POI.  *Id.* at 48.  The domestic industry's practical production capacity,

13

production quantity, capacity utilization, and U.S. shipments increased over the POI.  *Id.* at 47-

48.  And the domestic industry's employment-related performance indicia, the industry's number

of production workers; the industry's total hours worked and wages paid; and the industry's

revenues, gross profits, operating and net income, all increased over the POI.  *Id.* at 48-49.

These favorable developments occurred at the same time as the volume of cumulated subject

imports declined and subject imports lost market share to the domestic industry.  *Id.* at 39 n. 217.

53.     Notwithstanding the inverse relationship between domestic industry performance

and subject import market share, the Commission concluded that the domestic industry was

materially injured by reason of subject imports.

54.     The Commission found that cumulated subject imports had significant adverse

price effects during the POI.  *Id.* at 46.  The Commission reasoned that cumulated subject

imports significantly undersold domestically produced FRCs, leading to a shift in market share

from the domestic industry to cumulated subject imports in the overall market from 2020 to

2021, prior to the imposition of provisional duties on FRCs from China in *FRC I*, and in the

replacement market from 2020 to 2022 largely attributable to FRCs from Mexico.  It also

concluded that subject imports prevented price increases that would have otherwise occurred to a

significant degree in 2020 and 2021.  *Id.*

55.     The Commission found that cumulated subject imports had a significant adverse

impact on the domestic industry.  This Commission reasoned that a significant volume of

cumulated subject imports significantly undersold the domestic like product, leading to a shift in

market share from the domestic industry to cumulated subject imports in the overall market from

2020 to 2021, prior to the imposition of provisional duties on FRCs from China in *FRC I*, and in

the replacement market from 2020 to 2022.  The Commission further found that subject imports

prevented price increases that would have otherwise occurred to a significant degree in 2020 and

2021.

56.     The Commission discounted the evidence of the domestic industry's improvement

by attributing it to the provisional duties imposed in *FRC I*.  *See, e.g.*, *id.* at 42-47, 50, and 51

n. 278, 53.  The Commission also focused on trends within the replacement channel (as opposed

to the OEM channel).  Even though the domestic industry's gains in the OEM channel "offset

volume losses in the replacement market," the Commission treated the domestic industry's

decline in market share in the replacement channel as evidence of material injury.  *Id.* at 43 & n.

240.

57.     The Commission discounted the significance of its negative determinations in

*FRCs I* in the *FRCs II* investigation.  It reasoned that the Commission is not bound by its prior

determinations and that its decision in *FRCs I* was based on a different record with a different

scope, and only concerned imports of FRCs (and certain additional components) from China, and

not Mexico.  *Id.* at 54.

58.     Commissioner Karpel's affirmative determination differed from the

Commission's affirmative determination insofar as Commissioner Karpel excluded the

performance of one domestic producer from the domestic industry.  *Id.* at 61-65.  Commissioner

Karpel reached an affirmative determination notwithstanding her conclusions that: (1) subject

imports did not depress domestic prices to a significant degree or prevent price increases that

would have otherwise occurred to a significant degree; (2) domestic prices generally increased

during the POI; (3) domestic industry improved its COGS-to-net-sales ratio over the POI; and (4)

there is no evidence that would indicate that domestic prices should have or could have been

higher than they were, particularly as the AUVs of *** net sales increase by significantly more than its unit COGS.

## STATEMENT OF CLAIMS

59.     The *Final Determination* is "unsupported by substantial evidence on the record, or otherwise not in accordance with law" as provided by 19 U.S.C. § 1516a(b)(1)(B)(i) for the following reasons:

## COUNT ONE

60.     Paragraphs 1 through 59 are incorporated by reference.

61.     Section 751(b) of the Tariff Act provides that the Commission "may not review" a prior negative determination within 24 months of its publication absent "good cause."  The Commission also has inherent authority in administering the Tariff Act to preserve the integrity of its prior decisions.

62.     In its Final Determination, the Commission:

a.   failed to address interested parties' Section 751(b) arguments;

b.   failed to conclude that a petitioner must show good cause to review a negative determination within two years;

c.   failed to find that Petitioner was seeking a review of the Commission's prior determination in *FRCs I*;

d.   failed to find that Petitioner did not and could not show good cause;

e.   failed to find that Section 751(b) barred an affirmative determination against China in *FRCs II*; and

f.   failed to acknowledge or exercise its inherent authority in administering the Tariff Act to regulate and maintain the integrity of its own proceedings by reaching a negative determination in *FRCs II*.

16

63.   The Commission's decision to reach an affirmative determination in *FRCs II* notwithstanding its negative determinations in *FRC I*, and the subsidiary findings and conclusions on which this decision rests as specified above, are unsupported by substantial evidence and otherwise not in accordance with law.

## COUNT TWO

64.   Paragraphs 1 through 63 are incorporated by reference.

65.   In its Final Determination, the Commission:

   a.   failed to adequately explain why it was reaching an affirmative determination against China in *FRCs II* notwithstanding its prior negative determination in *FRCs I*;

   b.   failed to adequately explain why it was crediting evidence or findings that it had previously rejected in *FRCs I*; and

   c.   inconsistently and without adequate explanation emphasized the differences between the investigations in *FRCs I* and *FRCs II* for some purposes, while elsewhere crediting evidence and findings from *FRCs I* for other purposes.

66.   The Commission's decision to reach an affirmative determination in *FRCs II* notwithstanding its negative determinations in *FRC I*, and the subsidiary findings and conclusions on which this decision rests as specified above, are unsupported by substantial evidence and otherwise not in accordance with law.

## COUNT THREE

67.   Paragraphs 1 through 66 are incorporated by reference.

68.   In its Final Determination, the Commission:

a.  applied the wrong legal standard in conducting the related-party analysis;

b.  reversed its preliminary determination that this party's primary interest is in importation and not domestic production given its ratio of imports to domestic production and its stated reasons for importation (lowering its costs and expanding sales for its largest customers) notwithstanding that no facts were introduced in the final phase investigation that detracted from the Commission's preliminary finding; and

c.  failed to properly consider the facts that: (1) this party did not move production to Mexico during the POI due to subject import competition; (2) its exclusion would not mask any injury; (3) this party's primary interest lies in importation, which is consistent with its relatively low capacity utilization (and resulting performance and financial indicators) and high ratio of subject imports to domestic production.

69.  The Commission's decision not to exclude a related party from the domestic industry in *FRCs II,* and the subsidiary findings and conclusions on which this decision rests as specified above, are unsupported by substantial evidence and otherwise not in accordance with law.

## COUNT FOUR

70.  Paragraphs 1 through 69 are incorporated by reference.

71.  In its Final Determination, the Commission:

a.  improperly interpreted Section 771(7)(G) not to bar cumulation under the circumstances of these investigations;

b.  ignored relevant language from the SAA regarding the meaning and purpose of Section 771(7)(G); and

18

    c.   erroneously determined that "the current investigations are not the same investigations as those in FRC I and that that a negative determination in a prior investigation is not the same as a termination in these investigations."

72.    The Commission's decision in *FRCs II* to "cumulate subject imports from China and Mexico for purposes of {its} material injury analysis" and the subsidiary conclusions on which this decision rests as specified above, are unsupported by substantial evidence and otherwise not in accordance with law.

## COUNT FIVE

73.    Paragraphs 1 through 72 are incorporated by reference.

74.    In its Final Determination in *FRCs II,* the Commission concluded that cumulated subject imports had significant adverse price effects on the domestic industry during the POI .

75.    In its analysis of the price effects of cumulated subject imports of the domestic industry, the Commission:

    a.   erroneously concluded that underselling had significant adverse price effects;

    b.   failed to recognize that despite underselling, subject imports lost market share to the domestic like product;

    c.   improperly discounted the evidence of the domestic industry's improvement in 2022 by attributing it to the provisional duties imposed in *FRCs I*;

    d.   failed to recognize that the decline in the domestic industry's share of the replacement market in 2022 was attributable to the industry's strategic decisions to prioritize its OEM customers and that subject imports were pulled into the market by demand considerations;

e.   failed to properly consider the impact of trends within the OEM channel, where
    new railcar builds fell between 2020 and 2021 but increased significantly between
    2021 and 2022;

f.   failed to reconcile its reasoning with its decision in *FRCs I*; and

g.   failed to properly consider the fact that the domestic industry does not produce
    FRCs with Bedloe technology, which placed it at a competitive disadvantage in
    competing for business.

76.    The Commission's decision that cumulated subject imports had significant
adverse price effects during the *FRCs II* POI, and the subsidiary findings on which this
conclusion rests as specified above, are unsupported by substantial evidence and otherwise not in
accordance with law.

## COUNT SIX

77.    Paragraphs 1 through 76 are incorporated by reference.

78.    In its Final Decision in *FRCs II,* the Commission concluded that during the POI
cumulated subject imports had an adverse impact on the domestic industry.

79.    In its analysis of the impact of cumulated subject imports on the domestic
industry, the Commission:

a.   failed to properly consider the fact that the domestic industry's condition
    improved during the POI by virtually every measure of performance;

b.   improperly discounted the evidence of the domestic industry's improvement in
    2022 by attributing it to the provisional duties imposed in *FRCs I*;

c.   improperly focused on trends within the replacement channels, failing to recognize that domestic producers did not have the capacity or interest in serving this market due to their focus on the OEM market;

d.   failed to reconcile its reasoning with its decision in *FRCs I*;

e.   failed to properly consider the impact of trends within the OEM channel, where new railcar builds fell between 2020 and 2021 but increased significantly between 2021 and 2022; and

f.   failed to properly consider the fact that the domestic industry does not produce FRCs with Bedloe technology, which placed it at a competitive disadvantage in competing for business.

80.   The Commission's decision that cumulated subject imports had an adverse impact on the domestic industry during the *FRCs II* POI, and the subsidiary findings on which this conclusion rests as specified above, are unsupported by substantial evidence and otherwise not in accordance with law.

## COUNT SEVEN

81.   Paragraphs 1 through 80 are incorporated by reference.

82.   In her separate Final Determination in *FRCs II*, Commissioner Karpel concluded that during the POI cumulated subject imports had significant adverse price effects on the domestic industry and had an adverse impact on the domestic industry.

83.   Although Commissioner Karpel defined the domestic industry to exclude one company which the Commission Majority had included as a member of that industry, Commissioner Karpel relied on the same basic factors as the Commission Majority in price and impact analyses.

84.     The flaws in the Commission Majority analyses, discussed above, are also found in Commissioner Karpel's opinion.

85.     Commissioner Karpel's decision that cumulated subject imports had adverse price effects on the domestic industry and an adverse impact on the domestic industry during the POI, and the subsidiary findings on which these conclusions rest, are unsupported by substantial evidence and otherwise not in accordance with law.

## COUNT EIGHT

86.     Paragraphs 1 through 85 are incorporated by reference.

87.     Petitioner's counsel, █████████████████████, engaged in unethical conduct by taking a position in *FRCs II* that was directly contrary to the interests of Amsted, his former client in *FRCs I*, after having received business proprietary information ("BPI") and other confidential information from Amsted in *FRCs I,* which ██████ misused against Amsted in *FRCs II.*

88.     ██████████ unethical conduct and misuse of BPI obtained from Amsted provided Petitioner with an unfair advantage in *FRCs II* in their claim against all interested parties, including Plaintiff Strato, opposing the *FRCs II* petition.

89.     At the beginning of the *FRCs II* investigation, Amsted requested that the Commission disqualify ████████████████████, from further participation *FRCs II.*

90.     The Commission refused to make any determination regarding Amsted's allegations of attorney misconduct and ethical conflicts, and as a result, did not disqualify ███ ██████.

91.     The Commission's refusal to make any determination regarding Amsted's allegations against ███████ and to disqualify ██████████████████████, from the *FRCs II* investigation, was arbitrary, capricious, and an abuse of discretion, and renders the Commission's *FRCs II* determination unsupported by substantial evidence and otherwise not in accordance with law.

\*       \*       \*

## PRAYER FOR RELIEF

For the reasons stated above, Strato respectfully requests that this Court:

1.  Hold that the Commission's *Final Determination* in the subject investigation is unsupported by substantial evidence on the record and otherwise not in accordance with law;

2.  Remand the investigation to the Commission for disposition consistent with any orders and opinions of this Court; and

3.  Grant such other relief as may be just and proper.

Respectfully submitted,

GRUNFELD, DESIDERIO, LEBOWITZ, SILVERMANT & KLESTADT LLP

*/s/ Andrew T. Schutz*
Andrew T. Schutz
Ned H. Marshak
Jordan C. Kahn
Michael S. Holton

*Counsel to Plaintiff Strato, Inc.*

Dated: October 11, 2023

23