Slip Op. 26-110

**UNITED STATES COURT OF INTERNATIONAL TRADE**

| | |
|---|---|
| **WABTEC CORP.,**<br><br>**Plaintiff,**<br><br>**and**<br><br>**STRATO, INC.,**<br><br>**Consolidated Plaintiff,**<br><br>**v.**<br><br>**UNITED STATES,**<br><br>**Defendant,**<br><br>**and**<br><br>**COALITION OF FREIGHT COUPLER PRODUCERS,**<br><br>**Defendant-Intervenor.** | **Before: Gary S. Katzmann, Judge**<br>**Consol. Court No. 23-00157** |

**OPINION**

[ The U.S. International Trade Commission's remand results are sustained. ]

Dated: September 14, 2026

C. Kevin Marshall, Jones Day, of Washington, D.C., argued for Plaintiff Wabtec Corporation. Also on the briefs were Henry J. Dickman, Shelbie M. Rose, and Hannah Templin.

James M. Smith, Covington & Burling LLP, of Washington, D.C, argued for Consolidated Plaintiff Strato, Inc. Also on the briefs were Sooan (Vivian) Choi, Wanyu Zhang and John Catalfamo; and also Andrew T. Schutz and Ned H. Marshak, Grunfeld, Desiderio, Lebowitz, Silverman & Klestadt LLP, of Washington, D.C.

Michael Haldenstein, Attorney-Advisor, Office of the General Counsel, U.S. International Trade Commission, of Washington, D.C., argued for Defendant United States. Also on the briefs were Margaret D. MacDonald, General Counsel, and Karl Von Schriltz, Assistant General Counsel for Litigation, and Garrett L. Peterson, Attorney-Advisor.

Daniel B. Pickard, Buchanan Ingersoll & Rooney PC, of Washington, D.C., argued for Defendant-Intervenor Coalition of Freight Coupler Producers. Also on the briefs was Claire M. Webster.

Katzmann, Judge: The court returns in this case to a challenge to the determinations of the U.S. International Trade Commission's ("the Commission") that importation from China and Mexico of freight rail couplers ("FRCs"), components that connect freight rail cars, materially injured the domestic industry. See Certain Freight Rail Couplers and Parts Thereof from China, 88 Fed. Reg. 43398, 43398–99 (ITC July 7, 2023), P.R. 189 ("China Determination"); Certain Freight Rail Couplers and Parts Thereof from Mexico, 88 Fed. Reg. 77612, 77612 (ITC Nov. 13, 2023) ("Mexico Determination") (collectively, "Final Determinations").[1] In formulating the composition of the domestic industry for the purposes of the underlying antidumping and countervailing duty investigations, the Commission concluded in 2023 that appropriate circumstances did not exist to exclude Amsted, a domestic producer of FRCs and U.S. importer of Mexican FRCs, from the definition of the domestic industry. See Certain Freight Rail Couplers and Parts Thereof from China, Inv. Nos. 701-TA-682, 731-TA-1592 (Final) at 23, USITC Pub. 5438 (July 2023), P.R. 190, C.R. 178 ("Original Views").

When brought to this court for review, the court found last year in an Opinion and Remand Order that the Commission's determination not to exclude Amsted was not supported by

[1] The Commission's final determinations in the China and Mexico investigation became staggered when the U. S. Department of Commerce ("Commerce") reached an earlier final antidumping and countervailing duty determination for China. See Certain Freight Rail Couplers and Parts Thereof From China and Mexico; Scheduling of the Final Phase of Countervailing Duty and Anti-Dumping Duty Investigations, 88 Fed. Reg. 16031, 16032 (ITC Mar. 15, 2023). Plaintiffs in this case challenge the China Determination. See Compl. ¶ 1, Sept. 13, 2023, ECF No. 9. A separate case challenging the Mexico Determination was stayed pending resolution of the instant case. See Order Granting Consent Mot. to Stay, Amsted Rail Co. v. United States, No. 23-00268 (U.S. Ct. Int'l Trade filed Dec. 15, 2023), Mar. 3, 2025, ECF No. 55. Because the Commission cumulated imports from China and Mexico for the purpose of its investigation, the two separate determinations follow the same analysis and reach the same result.

substantial evidence and remanded for "the Commission's reconsideration or further explanation of its decision." Wabtec Corp. v. United States, 49 CIT __, __, 805 F. Supp. 3d 1326, 1350 (2025) ("Remand Order"). "Given that Amsted was the second largest domestic producer, the court [did] not consider the Commission's material[-]injury determination" at that time, deferring its consideration of that issue until after the Commission satisfactorily reconsidered or further explained its determination regarding the composition of the domestic industry. Id. at 1349.

On remand, the Commission continued to find that appropriate circumstances do not exist to exclude Amsted from the domestic industry and maintained its original determination that the domestic industry was materially injured by reason of subject imports (FRCs) from China that were sold in the United States at less than fair value and that were subsidized by the government of China. Views of the Comm'n on Remand at 1–2, Feb. 11, 2026, ECF No. 117 ("Remand Results"). Plaintiff Wabtec Corporation ("Wabtec") and Consolidated Plaintiff Strato, Inc. ("Strato") (collectively "Plaintiffs"), both U.S. importers of FRCs, challenge the Remand Results. See Pls.' Rule 56.2(H) Cmts. on the Int'l Trade Comm'n's Remand Determination, Mar. 13, 2026, ECF No. 124 ("Pls.' Remand Cmts."); Pls.' Mot. for J. on the Agency R. at 1, Aug. 19, 2024, ECF No. 45 ("Pls.' Br."). Plaintiffs ask the court to look behind the curtain to evaluate the votes of the individual Commissioners. See Pls.' Remand Cmts. at 18. Plaintiffs argue that Commissioner Kearns's further analysis of the domestic industry in support of the Commission's determination not to exclude Amsted is contrary to the court's Remand Order and not supported by substantial evidence. See id. at 5–16. Plaintiffs also continue to argue that the Commission's affirmative material-injury determination is not supported by substantial evidence and not in accordance with law. See id. at 16–23.

The court concludes that the Commission's determination that appropriate circumstances

do not exist to exclude Amsted from the domestic industry, as developed further in the Remand Results, and its affirmative material-injury determination are supported by substantial evidence and in accordance with law. Thus, the court sustains both of the Commission's determinations in the Remand Results.[2]

## BACKGROUND

The court presumes familiarity with the facts and legal framework underpinning the administrative and judicial proceedings leading up to the Remand Order, see Remand Order, 805 F. Supp. 3d at 1334–36, and now recounts only that which is relevant to the court's review of the Remand Results.

### *I. Legal Background*

To facilitate fair trade, "[t]he Tariff Act of 1930, as amended, permits Commerce to impose two types of duties on imports that injure domestic industries:" countervailing duties on goods that receive countervailable subsidies from a foreign government and antidumping duties on goods sold in the United States at less than fair value. Guangdong Wireking Housewares & Hardware Co. v. United States, 745 F.3d 1194, 1196 (Fed. Cir. 2014). Commerce only imposes duties where, as relevant here, the Commission makes an affirmative final determination that "an industry in the United States is materially injured or is threatened with material injury, or the establishment of an

[2] Plaintiffs brought two separate challenges to Commerce's affirmative determinations in the antidumping and countervailing duty investigations of FRCs from China and Mexico. See Wabtec Corp. v. United States, 49 CIT __, __, 815 F. Supp. 3d 1390, 1396–97 (2025). The court previously remanded Commerce's determinations to reconsider or further explain its determinations of the scope of the investigations. Id. at 1417. On remand, Commerce continued to find that attached FRCs should not be excluded from the scope of the investigations. See Final Results of Redetermination Pursuant to Ct. Remand, Wabtec Corp. v. United States, Court Nos. 23-00160, 23-00161 (U.S. Ct. Int'l Trade filed Aug. 14, 2023) ("Wabtec II & III"), ECF Nos. 74, 76, Apr. 13, 2026. Plaintiffs' challenge to Commerce's remand redetermination there is pending before the court. See Wabtec Corp.'s Rule 56.2(H) Cmts. on the Dep't of Com.'s Remand Redetermination, Wabtec II & III, ECF Nos. 78, 80, May 13, 2026.

industry in the United States is materially retarded, by reason of imports, or sales (or the likelihood of sales) for importation." 19 U.S.C. §§ 1673d(b)(1); 1671d(b)(2). A Commission final injury determination generally comprises the votes of the six individual Commissioners, with the majority's vote deciding the final determination of the Commission. See U.S. Steel Grp. v. United States, 96 F.3d 1352, 1360, 1362 (Fed. Cir. 1996).

### *A. Domestic Industry and Related-Parties Analysis*

"[A]n industry in the United States," or the domestic industry, consists of the U.S. "producers as a whole of a domestic like product, or those producers whose collective output of a domestic like product constitutes a major proportion of the total domestic production of the product." 19 U.S.C. § 1677(4)(A). The statute states that the Commission "may" undertake a related-parties analysis and exclude from the domestic industry producers that are related to an exporter or importer of subject merchandise or which are themselves importers "in appropriate circumstances." Id. § 1677(4)(B); see also Torrington Co. v. United States, 16 CIT 220, 224, 790 F. Supp. 1161, 1168 (1992), aff'd, 991 F.2d 809 (Fed. Cir. 1993); Sandvik AB v. United States, 13 CIT 738, 748–49, 721 F. Supp. 1322, 1331–32, (1989), aff'd, 904 F.2d 46 (Fed. Cir. 1990); Empire Plow Co. v. United States, 11 CIT 847, 852, 675 F. Supp. 1348, 1352–53 (1987). "[T]he [related-parties] provision's purpose is to exclude from the industry headcount domestic producers substantially benefitting from their relationships with foreign exporters." USEC, Inc. v. United States, 25 CIT 49, 61, 132 F. Supp. 2d 1, 12 (2001), aff'd, 34 Fed. App'x 725 (Fed. Cir. 2002). "This provision was enacted 'so that domestic producers whose interests in the imports were strong enough to cause them to act against the domestic industry would be excluded from the [Commission's] consideration and investigation into material injury or threat thereof.' " Changzhou Trina Solar Energy Co. v. U.S. Int'l Trade Comm'n, 39 CIT 1105, 1117–18, 100 F. Supp. 3d 1314, 1326 (2015), aff'd, 879 F.3d 1377 (Fed. Cir. 2018) (quoting USEC, 25 CIT at

61, 132 F. Supp. 2d at 12).

### *B. Material-Injury Determination*

The statute provides that " 'material injury' means harm which is not inconsequential, immaterial, or unimportant." 19 U.S.C. § 1677(7)(A). In making a material-injury determination, the Commission evaluates "(1) the volume of subject imports; (2) the price effects of subject imports on domestic like products; and (3) the impact of subject imports on the domestic producers of domestic like products." Hynix Semiconductor, Inc. v. United States, 30 CIT 1208, 1210, 431 F. Supp. 2d 1302, 1306 (2006) (citing 19 U.S.C. § 1677(7)(B)(i)(I)–(III)); accord GEO Specialty Chems., Inc. v. United States, 33 CIT 125, 127 (Feb. 19, 2009). The Commission may also consider "such other economic factors as are relevant in the determination." Hynix Semiconductor, 30 CIT at 1210, 431 F. Supp. 2d at 1306 (quoting 19 U.S.C. § 1677(7)(B)(ii)).

In addition to finding material injury, the Commission must determine whether the injury is "by reason of" subject imports. 19 U.S.C. § 1673d(b). In undertaking this causation analysis, the Commission must examine factors other than subject imports to ensure that it is not attributing injury from other factors to the subject imports, thereby inflating an otherwise tangential cause of injury into one that satisfies the statutory material-injury threshold. See Statement of Administrative Action accompanying the Uruguay Round Agreements Act at 851–52, H.R. Rep. No. 103-316, vol. I (1994) ("SAA")[3]; Hynix Semiconductor, 30 CIT at 1223, 431 F. Supp. 2d at 1317 (requiring the Commission to "analyze compelling arguments that purport to demonstrate the comparatively marginal role of subject imports in causing that injury").

[3] The SAA "shall be regarded as an authoritative expression by the United States concerning the interpretation and application of the Uruguay Round Agreements and this Act in any judicial proceeding in which a question arises concerning such interpretation or application." 19 U.S.C. § 3512(d).

### *II. Factual Background*

#### *A. Freight Rail Couplers ("FRCs")*

FRCs "connect two freight cars together by automatically interlocking the knuckles of both FRCs when the freight cars are pushed together, eliminating the need for previously required and potentially dangerous manual input." Original Views at 9. In addition to connecting freight cars, FRCs "reduce shocks when freight cars are in transit or braking." Id. Freight cars typically use two FRCs to allow for coupling additional freight cars together on both ends of the car. Id.

#### *B. Two Investigations of FRCs*

Two separate antidumping and countervailing duty investigations into U.S. imports of FRCs are relevant here, one of FRCs from China with a period of investigation of 2019–2021 ("FRC I") and another of FRCs from Mexico and China with a period of investigation of 2020–2022. See Compl. ¶ 12, 20, Sept. 13, 2023, ECF No. 9. After Commerce issued an affirmative preliminary determination in FRC I, FRCs from China were subjected to provisional duties for the remainder of the FRC I investigations. See Freight Rail Coupler Systems and Certain Components Thereof From the People's Republic of China: Preliminary Affirmative Determination of Sales at Less-Than-Fair Value, 87 Fed. Reg. 14511, 14512–13 (Dep't Com. Mar. 15, 2022); see also Original Views at 39–40. At the end of FRC I, the Commission made a negative material injury determination and the investigation concluded without the imposition of further duties. Freight Rail Coupler Systems and Components from China, Inv. Nos. 701-TA-670, 731-TA-1570 (Final) at 3, USITC Pub. 5331 (July 2022), PR. 39, C.R. 42; see also Freight Rail Coupler Systems and Components from China, 87 Fed. Reg. 41144, 41144 (ITC 2022).

Plaintiffs' challenge here is to Commerce's later FRC II investigations covering a period of investigation of calendar years 2020–2022. Compl. ¶¶ 48–73 . At the end of FRC II, the Commission made an affirmative material injury determination. Id. at ¶ 28; see also China

Determination, 88 Fed. Reg. at 43398–99; see also Mexico Determination, 88 Fed. Reg. at 77612.

At multiple points in its analysis, the Commission distinguished FRC II from FRC I. For example, in its discussion of impact for the purposes of determining material injury, the Commission noted that:

> the Commission's decision in [FRC I] was based on a different record with a different scope, and of course only concerned imports of FRCs (and certain additional components) from China. Specifically, the Commission found that the increase in nonsubject imports from Mexico (subject of the current investigations) explained the domestic industry's market share loss over the [period of investigation].

Original Views at 58.

### *C. Remand Proceedings*

Between the Commission's original determination and its Remand Results, one voting Commissioner departed from the agency. See Def. United States Int'l Trade Comm'n's Resp. in Supp. of the Comm'n's Remand Determinations at 4, Apr. 13, 2026, ECF No. 128 ("Gov't Remand Cmts."). The Commission filed the final Remand Results with the court on February 11, 2026, maintaining its original affirmative material injury determination "that an industry in the United States is materially injured by reason of imports of FRCs from China that are sold in the United States at less than fair value . . . , and that are subsidized by the government of China." Remand Results at 1. Commissioner Kearns wrote separately to "further explain . . . why appropriate circumstances do not exist to exclude Amsted from the domestic industry." Id. at 2.

## *III. Procedural History*

Wabtec and Strato filed joint comments in opposition to the Remand Results on March 13, 2026. See Pls.' Remand Cmts. In their comments, Wabtec and Strato pull forward arguments regarding material injury from their motion for judgment on the agency record. See Pls.' Br. Petitioner and Defendant-Intervenor the Coalition filed comments in support of the Remand

Results on March 16, 2026. See Cmts. in Supp. of the Final Results of Redetermination Pursuant to Court Remand, Mar. 16, 2026, ECF No. 126 ("Def.-Inter.'s Remand Cmts."). Defendant the United States ("the Government") filed its responsive comments in support of the Commission's Remand Results on April 13, 2026. See Gov't Remand Cmts.

The court issued and the Parties responded to questions in advance of oral argument. See Letter Issued by the Ct., May 19, 2026, ECF No. 135; U.S. Int'l Trade Comm'n's Written Resps. to the Ct.'s Questions, June 4, 2026, ECF No. 138 ("Gov't OAQ Resp."); Resp. to Questions for the Parties, June 4, 2026, ECF No. 140 ("Def.-Inter.'s OAQ Resp."); Resps. to Questions from the Ct. on Remand Determinations, June 4, 2026, ECF No. 142 ("Pls.' OAQ Resp"). With all papers filed, the court held oral argument as scheduled on June 24, 2026. See Order, June 9, 2026, ECF No. 146. As directed by the court, the Parties filed supplemental briefs following oral argument. See Pls.' Post-Arg. Submission, July 8, 2026, ECF No. 149; Post-Arg. Submission, July 8, 2026, ECF No. 150; Def. U.S. Int'l Trade Comm'n's Post-Arg. Submission, July 8, 2026, ECF No. 151.

## JURISDICTION AND STANDARD OF REVIEW

Jurisdiction lies under 28 U.S.C. § 1581(c). The court will "hold unlawful any determination, finding or conclusion found . . . to be unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Broadcom Corp. v. Int'l Trade Comm'n, 28 F.4th 240, 249 (Fed. Cir. 2022).

To be supported by substantial evidence, a determination must account for "whatever in the record fairly detracts from its weight," including "contradictory evidence or evidence from which conflicting inferences could be drawn." Suramerica de Aleaciones Laminadas, C.A. v. United States, 44 F.3d 978, 985 (Fed. Cir. 1994) (quoting Universal Camera Corp. v. N.L.R.B., 340 U.S. 474, 487–88 (1951)). Moreover, "when adequate evidence exists on both sides of an

issue, assigning evidentiary weight falls exclusively within the authority of the Commission." Nippon Steel Corp. v. United States, 458 F. 3d 1345, 1358 (Fed. Cir. 2006). The court may not "even as to matters not requiring expertise[,] . . . displace the [agency's] choice between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it de novo." Mitsubishi Materials Corp. v. United States, 20 CIT 328, 331, 918 F. Supp. 422, 425 (1996) (quoting Universal Camera Corp. v. NLRB, 340 U.S. 474 (1951)). Thus, the court "may not reweigh the evidence or substitute its own judgment for that of the agency." Usinor v. United States, 28 CIT 1107, 1111, 342 F. Supp. 2d 1267, 1272 (2004) (citation omitted).

A Commission determination regarding material injury is "presumed to be correct," and the burden of proving otherwise rests upon the challenging party. 28 U.S.C. § 2639(a)(1). "The court will find a determination unlawful where [the agency] has failed to carry out its duties properly, relied on inadequate facts or reasoning, or failed to provide an adequate basis for its conclusions." Rhone-Poulenc, Inc. v. United States, 20 CIT 573, 575, 927 F. Supp. 451, 454 (1996); see also 19 U.S.C. § 1516a(b)(1)(B)(i). The Commission "must examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.' " Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co. Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983) (quoting Burlington Truck Lines v. United States, 371 U.S. 156, 168 (1962)) (referring to the arbitrary and capricious standard); see also Yangzhou Bestpak Gifts & Crafts Co. v. United States, 716 F.3d 1370, 1378 (Fed. Cir. 2013) (citing Amanda Foods (Viet.) Ltd. v. United States, 33 CIT 1407, 1416, 647 F. Supp. 2d 1368, 1379 (2009)) (requiring the same of the agency with respect to the substantial evidence standard).

## DISCUSSION

Plaintiffs argue throughout their briefing that the departure of a single Commissioner before the remand changes the Commission's vote count, requiring a second remand or further

briefing from the parties. See Pls.' Remand Cmts. at 17–18. Plaintiffs also argue that, regardless of the Commission's composition on remand, the Commission's determination to include Amsted in the domestic industry and its affirmative injury determination are not supported by substantial evidence and not in accordance with law.

The court considers each of these arguments in turn below and concludes that (I) the departure of one Commissioner does not result in a new vote composition where the Commission on remand adopted its Original Views in their entirety, (II) the Commission's determination as to the composition of the domestic industry as further explained by Commissioner Kearns is consistent with this court's Remand Order and supported by substantial evidence, and (III) the Commission's affirmative material-injury determination is supported by substantial evidence and in accordance with law.

### *I. The Composition of the Commission Does not Affect the Court's Analysis*

In issuing a redetermination on remand, the Commission has two options. "First, the agency can offer a fuller explanation of the agency's reasoning at the time of the agency action," Biden v. Texas, 597 U.S. 785, 808 (2022) (quoting Dep't of Homeland Sec. v. Regents of Univ. of Cal., 591 U.S. 1, 20 (2020)), in which case " 'the agency may elaborate' on its initial reasons for taking the action, 'but may not provide new ones,' " id. (quoting Regents, 591 U.S. at 21). "Alternatively, 'the agency can deal with the problem afresh by taking new agency action.' " Id. (quoting Regents, 591 U.S. at 21). Here, the Commission took the first path: the Commission presented the same views, with fuller explanation provided by one of the Commissioners. See Remand Results at 1–2; see also Gov't Remand Cmts. at 30 (noting that on remand, "none of the Commissioners changed their views on domestic industry or injury" and that "Commissioner Kearns provided further explanation"). The court holds that the change in the number of Commissioners on remand has no bearing on the court's analysis because the Commission

provided further explanation of its initial determinations, rather than taking new agency action.

When the Commission issued its Original Views, its determination both as to the composition of the domestic industry and as to material injury were split. See Original Views at 17 n.66, 3 n.1.[4] On the composition of the domestic industry, Commissioners Kearns and Schmidtlein found that appropriate circumstances do not exist to exclude Amsted and Commissioners Karpel and Johanson provided separate views finding that appropriate circumstances do exist to exclude Amsted from the domestic industry. Id. at 17 n.66; see also Separate Views of Chairman David S. Johanson and Commissioner Amy A. Karpel on Related Parties (July 7, 2023), P.R. 190, C.R. 180. Under 19 U.S.C. § 1677(11), which states that where the Commissioners' votes "are evenly divided . . . the Commission shall be deemed to have made an affirmative determination," the two votes affirmatively determining that appropriate circumstances do not exist to exclude Amsted constituted the Commission's majority determination. On material injury, Commissioners Kearns, Schmidtlein, and Karpel found that an industry in the United States is materially injured or threatened with material injury by reason of subject imports, while Chairman Johanson determined that an industry in the United States is not materially injured or threatened with material injury by reason of those imports. See Original Views at 3 n.1.

Commissioner Schmidtlein departed the agency on February 1, 2025. Gov't Remand Cmts. at 4. With three participating Commissioners remaining on remand, the Commission maintained its previous determinations regarding the domestic industry and material injury.

---

[4] Commissioner Stayin did not participate in these investigations, see Original Views at 3 n.2, and one seat on the Commission was unoccupied at the time of the Commission's investigation such that only four Commissioners weighed in on the original determination: Chairman Johanson, Commissioner Karpel, Commissioner Kearns, and Commissioner Schmidtlein.

Remand Results at 1.[5] Commissioner Kearns provided additional analysis to "further explain" the Commission's determination that appropriate circumstances do not exist to exclude Amsted from the domestic industry. Id. at 2. Commissioners Karpel and Johanson adopted and incorporated their original views in their entirety. Id. at 1 n.2.[6]

The composition of the Commission, normally consisting of six Commissioners but here on remand reduced to just three, creates a somewhat unique scenario. Plaintiffs argue that, because Commissioner Schmidtlein departed from the agency, "a 2-1 majority of the Commission (Karpel and Johanson) now conclude[d] that Amsted does not belong in the domestic industry." Pls.' Remand Cmts. at 3 (emphasis omitted). According to Plaintiffs, "the deciding vote in favor of an affirmative determination rest[ed] on a factual premise that a majority of the Commission has rejected." Id. at 4. Plaintiffs also argue that "[t]wo of the three sitting Commissioners reached an affirmative injury determination, but did so on different records" such that "each of the Commission's two votes in support of an affirmative injury determination on the first remand must independently be supported by substantial evidence and not contrary to law." Id. at 18.

Contrary to Wabtec's position, the departure of one Commissioner during the course of these proceedings does not mean that the Commission's determinations lack sufficient support

---

[5] The first page of the Remand Results presented the "Views of the Commission on Remand," as opposed to the views of any individual Commissioner. Remand Results at 1. Therein, the Commission stated that "[u]pon consideration of the remand order and based on the evidence in the record of these investigations, we again determine that an industry in the United States is materially injured by reason of imports of FRCs from China that are sold in the United States at less than fair value . . . , and that are subsidized by the government of China." Id.

[6] Chair Karpel "adopt[ed] and incorporate[d] the Commission's original determination finding that the domestic industry is materially injured by reason of subject imports, and the separate views on related parties that she and Commissioner Johanson joined in the original determination." Remand Results at 1 n.2. Commissioner Johanson "adopt[ed] and incorporate[d] the separate views on related parties that he and Chair Karpel joined in the original and his dissenting views in the original." Id.

because the Commission's analysis has not changed on remand. The three Commissioners remaining could have " 'deal[t] with the problem afresh' by taking new agency action," Regents, 591 U.S. at 21 (quoting SEC v. Chenery Corp., 332 U.S. 194, 201 (1947)), but they did not do so. Cf. Diamond Sawblades Mfrs. Coal. v. United States, 612 F.3d 1348, 1353–54 (Fed. Cir. 2010) (noting that, following remand for further explanation, the Commission reversed its determination on material injury). Instead, the "Views of the Commission on Remand," presented by all three Commissioners, reiterated the Original Views. See Remand Results at 1 & n.2. Likewise, Commissioner Kearns in his views on remand acknowledged that he could "reconsider" his analysis but, finding that route to be "unnecessary," he opted to "further explain" the Commission's original determinations. Id. at 2. In doing so, Commissioner Kearns "elaborate[d]" on the reasons providing in the Original Views without providing new reasons for those views. See Regents, 591 U.S. at 21.

Because the Commission on remand adopted the Original Views with elaboration, not new reasons, the court considers the Remand Results to be further explanation of the Commission's initial determinations rather than "new agency action." Id. (emphasis in original); see also Diamond Sawblades, 612 F.3d at 1358 (affirming remand order that "simply required the Commission to explain in greater detail its decision and reasoning such that the court would have a basis for proper review"). The votes supporting the Commission's determinations "at the time of the agency action" are unchanged by the further explanation that followed. Regents, 591 U.S. at 20 (emphasis omitted) (internal quotation marks and citation omitted). The court therefore turns to the substance of those determinations and considers whether the Commission's Original Views, as supplemented by the further explanation provided in the Remand Results, are supported by substantial evidence and in accordance with law.

### *II. The Commission's Determination that Appropriate Circumstances Do Not Exist to Exclude Amsted from the Domestic Industry as Further Explained by Commissioner Kearns Is Supported by Substantial Evidence and in Accordance with Law*

Recall that the Commission "may" undertake a related-parties analysis and exclude a producer of the domestic like product who is also an importer of the subject merchandise "in appropriate circumstances." 19 U.S.C. § 1677(4)(B)(i). The term "may" reflects that exclusion of a domestic party is not mandatory and is left to the discretion of the Commission. See Nucor Corp. v. United States, 32 CIT 1380, 594 F. Supp. 2d 1320, 1346 (2008) (emphasizing the term "may" in concluding that the Commission has discretion in applying a different provision of the statute regarding the cumulation of subject merchandise from different countries). Legislative history confirms this interpretation, as the SAA states that the agency "will have discretion to apply this provision." SAA at 858.

This court has repeatedly upheld the Commission's consideration of five factors in deciding whether "appropriate circumstances" exist for exclusion in a related-parties analysis:

> (1) the percentage of domestic production attributable to the importing producer; (2) the reason the U.S. producer has decided to import the product subject to investigation (whether the firm benefits from unfair trade practice or to enable them to continue production and compete in the domestic market); (3) whether inclusion or exclusion of the importing producer will skew the data for the rest of the industry; (4) the ratio of import shipments to U.S. production for the importing producer; and (5) whether the primary interest of the importing producer lies in domestic production or importation.

Changzhou Trina, 39 CIT at 1121–22, 100 F. Supp. 3d at 1329 (quoting Allied Mineral Prods., Inc. v. United States, 28 CIT 1861, 1865 (2004)); see also Torrington Co., 16 CIT at 224, 790 F. Supp. at 1168. "The Commission is not required to make findings as to each specific factor." Allied Mineral, 28 CIT at 1865; Sandvik AB, 13 CIT at 749, 721 F. Supp. at 1332; Changzhou Trina, 39 CIT at 1122, 100 F. Supp 3d at 1329.

Here, the Commission originally found that appropriate circumstances do not exist to

exclude Amsted primarily because it found under factor (2) that Amsted's "exclusion from the domestic industry would mask declines in the industry's performance caused by subject import competition," and because it found under factor (3) that Amsted's "domestic production activities were shielded from competition with subject imports from China and Mexico during the [period of investigation]." Original Views at 23. The Commission noted under factors (1) and (4) that Amsted "imported and sold the vast majority of subject imports from Mexico during the [period of investigation]," and under factor (5) that "[Amsted] maintains that its subject imports from Mexico complement its domestic production rather than compete with it." Id. at 19. The Commission concluded that, despite its findings under factors (1), (4), and (5), "the record shows that" appropriate circumstances do not support exclusion. Id. The court remanded the Commission's determination not to exclude Amsted from the domestic industry because it "relied entirely on . . . underlying findings" under factors (2) and (3) "that were not supported by substantial evidence" and because "the Commission failed to appropriately weigh the [other] three factors." Remand Order, 805 F. Supp. 3d at 1344.

On remand, Commissioner Kearns provided further explanation on each of the five factors. Remand Results at 2. Plaintiffs argue that Commissioner Kearns's treatment of factors (1), (2), and (4) in his further explanation is not in accordance with law, and that his further analysis of factors (3) and (5) are contrary to the court's Remand Order and not supported by substantial evidence. See Pls.' Remand Cmts. at 6–16. For the reasons set forth below, the court concludes that the Commission's determination that appropriate circumstances do not exist to exclude Amsted from the domestic industry, as further explained by Commissioner Kearns on remand, is supported by substantial evidence and in accordance with law.

### *A. Commissioner Kearns's Further Explanation of the Commission's Treatment of the Factors is in Accordance with Law*

On remand, Commissioner Kearns provided further explanation for how the Commission analyzed factor (1) regarding Amsted's share of domestic production, factor (2) regarding Amsted's reason for importation, and factor (4) regarding Amsted's ratio of imports to domestic production. Commissioner Kearns stated that factors (1) and (4) "address a threshold question, aiding in determining whether to delve deeper into the thorny issue of whether 'appropriate circumstances' exist to exclude." Remand Results at 12 (emphasis in original). On factor (2), Commissioner Kearns specified that "consideration of whether Amsted benefited from its subject imports is focused solely on its operations producing the domestic like product, . . . not on whether subject imports benefited its operations producing 'other' products outside the scope of investigation." Id. at 24. Plaintiffs take issue with Commissioner Kearns's further explanation of factors (1) and (4) as threshold factors and his focus on the domestic like product in analyzing factor (2).

#### *i. Commissioner Kearns Further Explanation that Factors (1) and (4) Are a Threshold Question Is in Accordance with Law*

Recall that factor (1) is "the percentage of domestic production attributable to the importing producer," and that factor (4) is "the ratio of import shipments to U.S. production for the importing producer. Changzhou Trina, 39 CIT at 1121–22, 100 F. Supp. 3d at 1329. Plaintiffs argue that "Commissioner Kearns cited no support for treating factors (1) and (4) as 'threshold questions,' " and that "he admitted his approach was both novel and provisional." Pls.' Remand Cmts. at 8 (quoting Remand Results at 10 n.36). According to Plaintiffs, Commissioner Kearns's "unprecedented approach caused him to effectively sweep these factors under the rug," by "reduc[ing] them to supposed triggers for review under other factors, and then those other factors did all the work, these two having (again) fallen away into irrelevance." Id. (quoting Remand

Results at 31).

Commissioner Kearns's further explanation that factors (1) and (4) are threshold factors is in accordance with law. "[A]s long as the Commission's analysis does not violate any statute and is not otherwise arbitrary and capricious, the Commission may perform its duties in the way it believes most suitable." U.S. Steel Grp., 96 F.3d at 1362. The factors that the Commission considers in determining whether appropriate circumstances exist to exclude a producer from the domestic industry were developed by the Commission and approved by this court, but do not come from the Commission's statutory mandate. Even in approving the factors, this court has noted that "[t]he Commission is not required to make findings as to each specific factor." Allied Mineral, 28 CIT at 1865.

Here, Commissioner Kearns explained why factors (1) and (4) are threshold factors, stating that "[u]nder the first factor, a very small producer is unlikely to be excluded because its data don't move the needle for the industry as a whole," and that "under the [fourth] factor, an importing producer with a very low ratio of import shipments to U.S. production is unlikely to be excluded because those imports are unlikely to have a meaningful impact." Remand Results at 12–13. This is a "satisfactory explanation" for the Commissioner's treatment of both factors as a threshold question. State Farm, 463 U.S. at 43 (1983) (requiring the agency to "articulate a satisfactory explanation for its action").

Treating factors (1) and (4) as a threshold question does not "effectively sweep these factors under the rug," as Plaintiffs argue. Pls.' Remand Cmts. at 8. To the contrary, treating these factors as a threshold question makes them potentially decisive in the analysis, and thus gives them weight. Gov't OAQ Resp. at 4. Regardless, the Commission need not have made a "finding[] as to each specific factor," and thus the Commission has discretion to give a particular factor less weight, or

even no weight so long as it provides a satisfactory explanation for its action. Allied Mineral, 28 CIT at 1865. Here, Commissioner Kearns provided a satisfactory explanation for the treatment of factors (1) and (4) as threshold factors and his further analysis of these factors does not violate any statute. Therefore, Commissioner Kearns's further explanation regarding these factors is in accordance with law. See U.S. Steel Grp., 96 F.3d at 1362.

#### *ii. Commissioner Kearns's Further Explanation Focusing on the Domestic Like Product in Considering Factor (2) Is Supported by Substantial Evidence and in Accordance with Law*

Recall that factor (2) is "the reason the U.S. producer has decided to import the product subject to investigation (whether the firm benefits from unfair trade practice or to enable them to continue production and compete in the domestic market)." Changzhou Trina, 39 CIT at 1121–22, 100 F. Supp. 3d at 1329. In its Original Views, the Commission concluded that Amsted's reason for importation was to "substitut[e] [FRCs] from Mexico for its domestic production of the same FRC products," Original Views at 20, and thus found this factor to support its determination not to exclude Amsted from the domestic industry. See id. at 23. On remand, the Commission continued to find that Amsted's operations were harmed by subject imports and Commissioner Kearns further explained that consideration of this factor "focused solely on [Amsted's] operations producing the domestic like product . . . not on whether subject imports benefitted from its operations producing 'other' products outside the scope of investigation." Remand Results at 24 (emphasis in original).

Plaintiffs argue that the court's Remand Order "clearly required the Commission to consider benefits to Amsted's domestic operations as a whole," and that Commissioner Kearns's focus on the Amsted's production of the domestic like product "openly disregarded" the court's directive. Pls.' Remand Cmts. at 11 (citing Remand Order, 805 F. Supp. 3d at 1344–45). Additionally, Plaintiffs assert that "there is no legal support for the view that Amsted can be

excluded only if its production of the domestic like product (FRCs) at a particular domestic facility . . . benefitted from imports." Id. (emphasis in original).

The Commission's focus on the impact of subject imports on Amsted's domestic production of FRCs rather than the impact on Amsted's domestic operations as a whole is not contrary to this court's Remand Order. In the Remand Order, the court instructed the Commission to "adequately account for facts suggesting that Amsted benefitted from the import of subject merchandise from Mexico," including Amsted's own reports that it lost no sales or revenue due to subject imports from Mexico and the fact that Amsted's domestic FRC production took place at a single facility of the seventeen it maintains across the United States. Remand Order, 805 F. Supp. 3d at 1345. The court did not specifically require that the Commission consider Amsted's domestic production as a whole and instead only found that "[t]he Commission did not adequately account for facts suggesting that Amsted benefitted from the import of subject merchandise from Mexico." Id. at 1345.

On remand, Commissioner Kearns accounted for facts suggesting that Amsted benefitted from the import of FRCs from Mexico, explaining that "whether subject imports benefitted its operations producing 'other' products outside the scope of the investigation, such as 'other rail products' that are bundled with FRCs," was not relevant to his analysis of harm to Amsted's domestic FRC production. Remand Results at 24. Commissioner Kearns noted that Amsted "has stated that Mexican production of FRCs benefits Amsted domestically by enabling Amsted to focus on producing products other than FRCs in the United States." Id. at 24–25. According to Commissioner Kearns, "the Commission's related[-]parties analysis, like its material[-]injury analysis, is appropriately and necessarily focused on production of the domestic like product, not on the production of other products outside of the scope of its investigation." Id. at 25.

Focusing on Amsted's domestic FRC production, Commissioner Kearns explained that Amsted's statements "are . . . not credible," because they are contrary to the record data. Id. Commissioner Kearns highlighted that Amsted's commercial shipments of domestically produced FRCs fell, "bely[ing] Amsted's claim that [its domestic FRC production facility] did not lose any sales to subject imports from Mexico." Id. at 21. Additionally, Commissioner Kearns considered that FRC jobs were lost in that domestic facility, that that facility's operating to net sales ratio worsened, that production of FRCs in that facility was cut leading to a decline in capacity utilization, and that the value of assets at that facility fell. Id. at 21–22. Thus, Commissioner Kearns's further explanation that Amsted's domestic production of FRCs did not benefit from subject imports is supported by substantial evidence. Commissioner Kearns's further explanation of the Commission's approach to factor (2), and specifically its focus on Amsted's domestic production of FRCs, reasonably explains why the facts suggesting that Amsted's operation as a whole benefitted from the import of subject merchandise from Mexico are not relevant, consistent with this court's directive in the Remand Order to account for those facts.

Plaintiffs also suggest that Commissioner Kearns's treatment of the second factor is not in accordance with law, arguing that "there is no legal support" for his view that "Amsted can be excluded only if its production of the domestic like product (FRCs) at a particular domestic facility . . . benefitted from imports." Pls.' Remand Cmts. at 11. Contrary to Plaintiffs' argument, and as described above, the Commission need not provide specific legal support for a chosen methodology "[s]o long as the Commission's analysis does not violate any statute and is not otherwise arbitrary and capricious." U.S. Steel Grp., 96 F.3d at 1362. When presented with a challenge to the Commission's methodology, the court examines "not what methodology [Plaintiffs] would prefer," but "whether the methodology actually used by the Commission was

reasonable." Shandong TTCA Biochem. Co. v. United States, 45 CIT __, __, 774 F. Supp. 2d 1317, 1329 (2011) (internal quotation marks and citation omitted). "As long as the agency's methodology and procedures are a reasonable means of effectuating the statutory purpose . . . the court will not . . . question the agency's methodology." Int'l Imaging Materials, Inc. v. United States, 30 CIT 1181, 1189 (2006) (quoting Ceramica Regiomontana, S.A. v. United States, 10 CIT 399, 404–05, 636 F. Supp. 961, 966 (1986)).

In further explaining the Commission's analysis of factor (2), Commissioner Kearns noted that "[t]he statute provides for the Commission to consider the effects of subject imports on operations producing the domestic like product in the United States." Remand Results at 25 n.74 (citing 19 U.S.C. § 1677(7)(B)(i)(II) and (III)). In doing so, Commissioner Kearns stated that the Commission's approach is "consistent with the statute and focus of the Commission's material[-]injury analysis." Remand Results at 24. Commissioner Kearns accordingly found it instructive, not controlling as Plaintiffs suggest, that "the Commission's related[-]parties analysis, like its material[-]injury analysis, is appropriately and necessarily focused on production of the domestic like product, not on the production of other products outside the scope of the investigation." Remand Results at 25. Indeed, the Commission's material-injury analysis evaluates "the impact of imports of such merchandise on domestic producers of domestic like products, but only in the context of production operations within the United States." 19 U.S.C. § 1677(7)(B)(i)(III). Because the statute elsewhere explicitly requires that the Commission's analysis focus on production of the domestic like product, Commissioner Kearns's further explanation that the related-parties analysis should also focus on Amsted's production of the domestic like product analysis is consistent with the statute.

Commissioner Kearns's further explanation is also consistent with the purpose of the

related-parties provision, which is "to reduce any distortion in industry data caused by the inclusion in the domestic industry of a related producer who is being shielded from the effects of the subject imports." SAA at 858. In Changzhou Trina and USEC, Inc., the court noted that producers who are incentivized to act against the domestic industry should be excluded to avoid distortion in the industry data. Changzhou Trina, 39 CIT at 1117–18, 100 F. Supp. 3d at 1326; USEC, 25 CIT at 61, 132 F. Supp. 2d at 12. Here, the Government suggests that Amsted's interest in imports of FRCs is strong enough to cause it to act against the domestic industry specifically by seeking to exclude important evidence of harm to the industry thereby distorting the industry data. See Tr. of Oral Argument at 32:9–33:24, June 24, 2026, ECF No. 148 ("Tr.").

Consistent with the Government's suggestion, Commissioner Kearns's further explanation of factor (2) emphasized Amsted's job losses at its domestic FRC facility, noting that the statute specifically provides for U.S. labor unions to petition for relief from import injury, as Defendant-Intervenor the Coalition did here. Remand Results at 8–9, 22. The Coalition represents Amsted's employees that manufacture FRCs in the United States at its domestic FRC production facility. See Original Views at 4. Had the Commission considered benefits to Amsted's domestic operations as a whole, the job losses at Amsted's domestic FRC production facility could have been masked by the benefits that subject imports provide to Amsted's production of non-subject merchandise.

Commissioner Kearns relied heavily on testimony from members of the Coalition, including one Coalition official who expressed his concern with the welfare of the Coalition members working at Amsted's domestic FRC production facility. See Remand Results at 9 (quoting Revised and Corrected Commission Hearing Transcript at 30–31 (ITC May 31, 2023), P.R. 160). Commissioner Kearns also considered the testimony of a member of the Coalition who

himself worked at Amsted's domestic FRC production facility and stated that "Amsted has told us the reason why production is down [at the facility] in part is because they've moved much of their production to Mexico[.] . . . We now only make parts . . . that Amsted is unable to make in Mexico." Id. (quoting Petitioner's Pre-Hearing Brief at Ex. 6 (May 11, 2023), P.R. 136, C.R. 143). Commissioner Kearns considered this to be persuasive evidence that Amsted was not benefitting or shielded from subject imports. Remand Results at 9. The Coalition noted at oral argument that "if Amsted is excluded from the data, those workers' data is excluded as well." Tr. at 42:14–15. The Coalition specifically noted that "the vice president of [the Coalition] appeared at the hearing in FRC [II] and testified as to the injury of the workers. If Amsted is excluded, the injury to those workers is ignored and their voices are silenced." Id. Commissioner Kearns thus reasonably explained that "excluding Amsted from the domestic industry would . . . result in the masking of injury, running contrary to the intent of statute." Remand Results at 27.

Commissioner Kearns also pointed to other investigations and cases where the Commission focused exclusively on production of the domestic like product. For example, the plaintiffs in General Motors Corp. v. United States argued that lost sales of the domestic like product, minivans, would result in future lost sales of other vehicles because of brand loyalty. 17 CIT 697, 701, 827 F. Supp. 774, 779–80 (1993). The court there noted that "[t]he statute clearly provides that 'the effect of . . . dumped imports shall be assessed in relation to the United States production of a like product,' " in that case, minivans, and that "lost sales of other vehicles are not to be considered." Id. at 701–02, 780 (emphasis omitted). Because Commissioner Kearns's analysis of whether Amsted benefits or is shielded from subject imports is consistent with the statute, the purpose of the related-parties analysis to avoid distortion in the industry data, and with the agency's practice in past investigations and cases, the Commission's related-parties

determination as further explained by Commissioner Kearns is supported by substantial evidence and in accordance with law.

### *B. Commissioner Kearns's Further Analysis of Skew Under Factor (3) Is Supported by Substantial Evidence and in Accordance with Law*

Recall that factor (3) is "whether inclusion or exclusion of the domestic producer will skew the data for the rest of the industry." Changzhou Trina, 39 CIT 1105 at 1121–22, 100 F. Supp. 3d at 1329. The Commission originally determined that "excluding [Amsted] would have the effect of masking declines in the domestic industry's market share, financial performance, and employment," as well as "the available capacity for FRC production in the United States." Original Views at 23. The court remanded that determination, finding that the Commission "provided no reasoning or substantial evidence supporting its conclusion that Amsted's exclusion would skew the domestic industry data." Remand Order, 805 F. Supp. 3d at 1345–46. The court emphasized that "[t]he exclusion of Amsted does not clearly result in skewed domestic industry data as the Commission seems to imply." Id. On remand, Commissioner Kearns continued to explain that factor (3) did not support exclusion, finding that "excluding Amsted from the domestic industry would actually result in the masking of injury, contrary to the intent of the statute." Remand Results at 27.

Plaintiffs argue that "Commissioner Kearns essentially regurgitated the Commission's prior, defunct analysis," ignoring the court's observation that " '[e]xclusion of data is not synonymous with skewing data.' " Pls.' Remand Cmts. at 14–15 (quoting Remand Order, 805 F. Supp. 3d at 1345). According to Plaintiffs, "Commissioner Kearns made no finding to suggest that Amsted's exclusion would skew the data . . . ." Id. at 15. To the contrary, on remand Commissioner Kearns highlighted evidence of injury that would be masked as a result of Amsted's exclusion, including the domestic industry's loss of market share, job losses in the domestic

industry, production and shipment declines, capacity utilization drops, and declining value of the domestic industry's net assets. See Remand Results at 27–28. Commissioner Kearns's additional analysis reflects that the exclusion of Amsted would result in the minimization of significant evidence of injury, and more than that, a change in general trends in the data. For example, Commissioner Kearns noted that, "[i]f Amsted is included, the domestic industry loses . . . market share to subject imports from 2020 to 2021," but that "[i]f it is excluded, the domestic industry gains . . . market share" during that same period. Id. at 27. This analysis explains that Commissioner Kearns's determination on factor (3) is consistent with the meaning of the word "skew" because it goes beyond considering whether the exclusion of Amsted would simply result in less data and instead focuses on changes in trends and masking of injury. Cf. Remand Order, 805 F. Supp. 3d at 1345–46. Therefore Commissioner Kearns provided sufficient reasoning and substantial evidence further explaining the Commission's determination that Amsted's exclusion would skew the domestic industry data.

### *C. Commissioner Kearns's Further Analysis of Amsted's Primary Interest Under Factor (5) Is Supported by Substantial Evidence and in Accordance with Law*

Recall that factor (5) is "whether the primary interest of the importing producer lies in domestic production or importation." Changzhou Trina, 39 CIT 1105 at 1121–22, 100 F. Supp. 3d at 1329. The Commission originally acknowledged that Amsted's primary interest supports exclusion, but concluded: "that alone is not dispositive in the Commission's related[-]party analysis." Original Views at 18. The court remanded the Commission's findings, stating: "[t]hat a fact is not dispositive does not mean it need not be accounted for." Remand Order, 805 F. Supp. 3d at 1347. On remand, Commissioner Kearns provided further support for the Commission's conclusion that this factor is not dispositive in this case. Remand Results at 30–31.

Plaintiffs argue that "Commissioner Kearns took essentially the same approach as before,"

and "admitted that" Amsted's primary interest lies in importation. Pls.' Remand Cmts. at 6. Plaintiffs argue that this finding "should have been conclusive," and go on to suggest that Commissioner Kearns "misunderst[ood] the fifth factor," because "[i]t actually looks to 'the primary interest of the importing producer,' not a particular facility of the importing producer." Id. at 7 (emphasis in original) (quoting Changzhou Trina, 39 CIT at 1121–22, 100 F. Supp. 3d at 1329). Contrary to Plaintiffs' suggestion, Commissioner Kearns did consider Amsted's primary interest as a whole under factor (5), not just the interests of Amsted's domestic FRC production facility. Indeed, Commissioner Kearns agrees with Plaintiffs that "the primary interest of Amsted as a whole (i.e., the multinational corporation) but specifically with respect to FRCs lies in importation." Remand Results at 30.

Having agreed with Plaintiffs regarding Amsted's primary interest, Commissioner Kearns went on to further explain the Commission's finding that this factor is not dispositive, explaining that "while a firm with a primary interest in importation generally should be excluded in other circumstances, that is hardly so under the facts of this case," because "[d]oing so would ignore the substantial injury [Amsted's domestic FRC production facility] and its workers experienced." Id. at 30–31. This analysis accurately reflects that factor (2) regarding whether the domestic producer benefits from or is harmed by subject imports is "[t]he most significant factor . . . in making the [related-parties analysis]." Allied Mineral, 28 CIT at 1864 (citing Empire Plow, 11 CIT at 853, 675 F. Supp. at 1353); see also Changzhou Trina, 39 CIT at 1121, 100 F. Supp. 3d at 1329. Finding that a factor is not dispositive is in accordance with law because, as described above, "[t]he Commission is not required to make findings as to each specific factor." Allied Mineral, 28 CIT at 1865. By noting that Amsted's primary interest in importation is not dispositive in light of the harm that subject imports caused Amsted's domestic FRC production facility during the period of

investigation, Commissioner Kearns adequately accounted for factor (5).

In sum, Commissioner Kearns's further explanation of the Commission's original related-parties analysis complies with this court's instructions to provide substantial evidence for its conclusions and appropriately weigh all the factors. Thus, the Commission's determination that appropriate circumstances do not exist to exclude Amsted from the domestic industry as further explained by Commissioner Kearns is supported by substantial evidence and in accordance with law. Having sustained Commerce's determination as to the composition of the domestic industry, the court now turns to the Commission's material-injury determination.

### ***III. The Commission's Affirmative Material-Injury Determination Is Supported by Substantial Evidence and in Accordance with Law***

Recall that, pursuant to the Tariff Act of 1930 as amended, the Commission determines whether a domestic industry is materially injured, or threatened with material injury, by reason of unfairly subsidized or dumped imports. See 19 U.S.C. §§ 1671d(b), 1673d(b). In making a material-injury determination, the Commission evaluates "(1) the volume of subject imports; (2) the price effects of subject imports on domestic like products; [] (3) the impact of subject imports on the domestic producers of domestic like products," Hynix Semiconductor, 30 CIT at 1210, 431 F. Supp. 2d at 1306 (citing 19 U.S.C. §§ 1677(7)(B)(i)(I)–(II)); accord GEO Specialty Chems., 33 CIT at 127, and "such other economic factors as are relevant to the determination." 19 U.S.C. § 1677(7)(B)(ii)). In addition, the Commission must consider whether the domestic industry is "materially injured, or threatened with material injury . . . by reason of subject imports." 19 U.S.C. §§ 1671d(b), 1673d(b). In undertaking this causation analysis, the Commission determines whether the effects "are not merely incidental, tangential, or trivial." Nippon Steel Corp. v. U.S. Int'l Trade Comm'n, 345 F.3d 1379, 1384 (Fed. Cir. 2003).

In its Original Views, the Commission determined that "an industry in the United States is

materially injured by reason of subject imports of FRCs from China [and Mexico] that are sold in the United States at less than fair value and subsidized by the government of China." Original Views at 64; see also Certain Freight Rail Couplers from Mexico and Parts Thereof, Inv. No. 731-TA-1593 (Final) at 3, USITC Pub. 5470 (Nov. 2023). On remand, the Commission maintained its affirmative material injury determination in its entirety, relying on its analysis from the Original Views. Remand Results at 1–2; see also Original Views.

Plaintiffs argue that the Commission's affirmative injury determination is not supported by substantial evidence and not in accordance with law because (A) the Commission ignored evidence showing that prices for domestic FRCs increased during the period of investigation and incorrectly concluded that provisional duties were the reason for the domestic industry's overall market share gain in 2022, Pls.' Br. at 37–38, 40–45, and (B) the Commission's consideration of various factors was inconsistent with the Commission's previous conclusions in the FRC I investigations, id. at 37–38, 46–54. The court addresses each of these arguments in turn below, concluding that the Commission's affirmative material-injury determination is supported by substantial evidence and in accordance with law.

### *A. The Commission Properly Considered All Relevant Evidence in Analyzing Material Injury*

In its Original Views, the Commission described a great deal of evidence regarding the price effects and impact of subject imports. In concluding that subject imports caused material injury to the domestic industry during the period of investigation, the Commission considered the prices for cumulated imports, the pounds of cumulated imports that undersold the domestic like product, the margins of under and overselling, reports from importer/purchasers, changes in market share due to underselling, and the ratio of cost-of-goods-sold to net sales. Original Views at 41–49. Much of this evidence supports the Commission's affirmative material-injury determination. For

example, the Commission determined that "prices for cumulated subject imports were below those for domestically produced FRCs in 75 of 110 . . . quarterly comparisons." Id. at 42 (citing U.S. Int'l Trade Comm'n Staff Report at Table V-9, (ITC June 5, 2023), C.R. 1, P.R. 1 ("Staff Report")). Additionally, the Commission noted that "[t]en of 15 responding importer/purchasers reported that, since 2020, they had purchased subject imports instead of the domestic like product," and that "[s]even of these ten importer/purchasers reported that cumulated subject import prices were lower than prices of the domestic like product." Id. at 43 (citing Staff Report at Table V-13).

Plaintiffs argue that "[t]he record . . . demonstrates that the domestic industry was not injured at all," citing to evidence that "the domestic industry . . . gained . . . percentage points of market share as subject imports increasingly oversold the domestic like product." Pls.' Remand Cmts. at 19 (emphasis in original). For example, the Commission found that the domestic industry's "share of apparent U.S. consumption decreased from . . . 2020 to . . . 2021 before increasing . . . in 2022." Original Views at 33 (emphasis added) (citing Staff Report at Tables IV-11 and C-1). Plaintiffs cite to several metrics like this demonstrating market improvement in 2021 to 2022 to suggest that the domestic industry did not experience injury by reason of subject imports. See Pls.' Br. at 36–40. However, while the Commission acknowledged that "the domestic industry's performance improved by most measures from 2021 to 2022," it attributed this improvement to "the imposition of provisional duties" imposed during the Commission's previous FRC I investigations of FRCs from China with a period of investigation of 2019–2021. Original Views at 54. The Commission found that these provisional duties "caused subject imports from China to recede from the U.S. market and oversell the domestic like product." Id.

Legislative history surrounding the Tariff Act of 1930 indicates that the Commission can consider the effect of provisional duties like those here:

> [W]hen the Commission finds evidence on the record of a significant change in data concerning the imports or their effects subsequent to . . . the imposition of provisional duties, the Commission may presume that such change is related to the pendency of the investigation. In the absence of sufficient evidence rebutting that presumption and establishing that such change is related to factors other than the pendency of the investigation, the Commission may reduce the weight to be accorded to the affected data.

SAA at 854. This reflects that "[t]he imposition of provisional duties . . . can cause a reduction in import volumes and an increase in price of both the subject imports and the domestic like product." Id. If the Commission could not consider if market share changes are related to provisional duties, then the Commission's ability to identify and discount data that have been distorted by such duties would be hindered.

While the Commission "acknowledge[d] that the domestic industry experienced overall improvements in its trade and financial indicia, [it] also observe[d] that its indicators declined 2020 to 2021 prior to provisional duties in 2022." Original Views at 54 n.278. The Commission accorded the evidence in 2021–2022 less weight, concluding that "the improvements only occurred after the industry received trade relief." Id. The Government also notes that FRCs from Mexico—which were not subject to the FRC I provisional duties—gained market share, unlike FRCs from China which were subject to the FRC I provisional duties. See Gov't OAQ Resp. at 12 (citing Remand Results at 21–23). Even considering that the domestic industry improved by most metrics while provisional duties were in effect, the Commission found that "the domestic industry remained unprofitable . . . with the domestic industry losing market share in the replacement market in each year of the [period of investigation] and [all] members of the domestic industry reporting operating and net losses in 2022." Original Views at 54.

Where "adequate evidence exists on both sides of an issue, assigning evidentiary weight falls exclusively within the authority of the Commission." Nippon Steel Corp., 458 F. 3d at 1358. Because the Commission provided ample evidence supporting its determination that the domestic

industry experienced material injury as a result of submit imports, and because it reasonably "reduce[d] the weight to be accorded to" data from after provisional duties were placed on FRCs from China, the Commission's determination is supported by substantial evidence and in accordance with law. SAA at 854.

### *B. The Commission's Different Findings in FRC I and FRC II Are Not Inconsistent Given the Different Scopes of Each Investigation*

Plaintiffs also argue that the Commission's consideration of certain non-price factors impacting purchasers' choice between domestic FRCs and Mexican and Chinese FRCs contradicts the Commission's findings in FRC I, where it made a negative material-injury determination. Pls.' Br. at 38–39, 48, 52. As discussed in the Remand Opinion, the Commission's findings in FRC I do not bind the Commission to any particular result in FRC II. Remand Order, 805 F. Supp. 3d at 1341. "This court has long held that the Commission's material-injury determinations are 'sui generis, involving a unique combination and interaction of many economic variables.' " Id. at 1342 (citing Armstrong Bros. Tool Co. v. United States, 489 F. Supp. 269, 279 (Cust. Ct. 1980)); see also Conn. Steel Corp. v. United States, 18 CIT 313, 318, 852 F. Supp. 1061, 1066 (1994); Timken Co. v. United States, 28 CIT 277, 290, 321 F. Supp. 2d 1361, 1372 (2004); AWP Indus., Inc. v. United States, 35 CIT 774, 790, 783 F. Supp. 2d 1266, 1282 (2011).

The Commission sufficiently explained its different conclusions in the two investigations, noting the different scopes of each investigation: FRC I covered knuckles, follower bodies, coupler yokes, and follower blocks imported from China from 2019–2021, while FRC II covered knuckles and coupler bodies imported from China and Mexico from 2020–2022. See Original Views at 58. The Commission highlighted that "the Commission [in FRC I] found that the increase in nonsubject imports from Mexico (subject of the current investigations) explained the domestic industry's market share loss over the [period of investigation]." Id.

For example, while the Commission found in FRC I that Bedloe technology[7] was a significant non-price factor influencing purchasers' choices between domestic FRCs and FRCs from China, the Commission found in FRC II that "most purchasers do not believe the technology is important." Original Views at 57. The Commission explained these divergent findings, noting that Bedloe technology was only available in Chinese FRCs. Id. at 57–58. Mexican FRCs without Bedloe technology were not in the scope of FRC I but were within the scope of FRC II. Id. The Commission also highlighted that Mexican FRCs without Bedloe technology represented a larger share of the U.S. market than Chinese FRCs during the period of investigation. Id. Thus, the Commission's finding that Bedloe technology was a significant factor in FRC I does not contradict its finding that Bedloe technology was not a significant factor in FRC II.

In sum, the Commission considered substantial evidence supporting its affirmative material injury determination and adequately accounted for evidence of domestic-market improvement during the period of investigation by reasonably discounting data from when provisional duties were in effect. The Commission also sufficiently explained that the different scopes of FRC I and FRC II account for the differences between the Commission's conclusions in those investigations. Accordingly, the Commission's affirmative material-injury determination is supported by substantial evidence and in accordance with law.

---

[7] "Bedloe" is one process of making the mold for FRC production. According to a declaration attached to the Petitioner's Pre-Hearing Brief, the railroad industry has used steel castings for their equipment since the original castings were made in North America in 1861. See Petitioner's Pre-Hearing Br. at Ex. 17, ¶ 2 (May 11, 2023), P.R. 136, C.R. 143. To make steel cast FRCs, molten steel is poured into sand molds that are held together with clay and water. Id. ¶ 3. FRCs require extra sand parts to be added to the mold. Id. ¶ 4. To make holes inside the casting, the extra sand part is coated with oil and baked to make it stronger. Id. "In the 1970s, chemical companies developed glues to chemically bond the sand together to make the cores. The chemically bonded sand [is] not heated to bake it like the old oil sands, so it is called no bake sand." Id. According to the declarant, "[t]he 'Bedloe' process is essentially one company's brand name for no bake casting." Id.; see also Petitioner's Post-Hearing Br. Ex. 4, ¶ 3 (May 26, 2023), P.R. 155.

**CONCLUSION**

For the reasons stated above, the Commission's determination that appropriate circumstances do not exist to exclude Amsted from the domestic industry and its ultimate affirmative injury determination are supported by substantial evidence and in accordance with law. Therefore, the court denies Plaintiffs' motion and sustains the Commission's determinations in the Remand Results. Judgment will enter accordingly.

**SO ORDERED.**

*/s/ Gary S. Katzmann*
Gary S. Katzmann, Judge

Dated: September 14, 2026
New York, New York